Case number 25-5188 Luther Poynter v. Aaron Bennett et al. Argument is not to exceed 15 minutes per side. Mr. Butler, you may proceed for the appellant. I'd like two minutes. Good morning. For the record, my name is William Butler. I represent Luther Poynter. I'd like to talk with you all this morning about two things. First thing I want to talk about is municipal liability requirements. The second thing I want to talk about is that Vernon County Detention Center has a custom or de facto policy which it followed. Going back to the first thing I want to discuss is we can impose municipal liability even though no individual actor is shown in our case. There are three elements that we need to show. We need to identify the custom or policy, we need to connect the policy to the municipality, and finally we need to show that the injuries were incurred due to the execution of that policy. Here's how we did that. First, we've shown that there is a custom or de facto policy of never classifying new inmates because of his or her past behavior while institutionalized. Second, we've shown that the de facto policy is Vernon County's policy. Third, we've shown that Luther Poynter's injuries were caused by inmates whose past institutional behavior was never considered. In fact, those two inmates, Wicks and Guess, had between them almost 30 instances of institutional violence or threats of violence. The second thing I want to discuss with you all is the Vernon County Detention Center's custom or de facto policy that they followed. They followed this policy in spite of the fact that the Kentucky Administrative Regulations require it to be required that the prior institutional violence be checked when an inmate comes in. They followed that in spite of the fact that they have some written regulations that track the KAR. So the detention center had policies that tracked the Kentucky requirement that inmates be evaluated? Your Honor, they have written, there are some written rules or you could call them regulations, but they don't follow them. In fact, they've never followed them. And in fact, one deposition that was taken was from Captain Elizabeth Boston, who testified in her deposition that she had been an employee of the Vernon County Detention Center since 2012. And that's through three separate jail administrations and never had the prior institutional violence of new inmates been checked when they came into the jail. Additionally, just a factual question. The populations are mixed. Do I understand correctly that this particular facility has some inmates who have already been convicted of state offenses and also houses pretrial county inmates? That's correct, Your Honor. As I understand it, a little hard hearing, but the Vernon County Detention Center houses both state inmates and what's called county inmates. Luther Pointer was a pretrial detainee in this instance. He'd been charged with not paying $3,000 worth of child support, so he was still, he was waiting. But the two populations were mixed together. That's correct. That's correct. In fact, all the whole jail population was housed in minimal security. That was, even though the KAR and those written regulations that are not followed state that there's minimal, medium, and maximum, everyone is put together except people that are housed in protective custody, but everyone else is in. So why were Wicks and Guess housed in this room? What were they? They were state offenders. They had been convicted. Tell me more. Well, I don't recall exactly. I believe, I don't know what the offenses were. I think, I believe that one, I can't remember whether it was a state inmate at the time, although he'd been in Vernon County Detention Center many, many times as a county detainee, and I don't remember. I believe the other one had been again, to have 30 instances of prior violence, you've got to be there a number of times. So that one might have been there for other crimes. That's correct. And I want to, I'd like to go back just a second to the, when I said that, I think you may have asked me about the, about the written regulations. Both the lower court misquoted Jeffrey Iser, who's the plaintiff's jail expert. It may have taken that misquote from the defendant's motion for summary judgment when that, when it was said that, quoted Iser as saying, the regulations were adequate, and actually what he said was, the regulations would be adequate. They neglected to add both the lower court judge, in his opinion, and the defendant in its motion, neglected to add, if followed, and then later in his statement, he said they weren't followed. In fact, I could, if the court's interested, page 29 into page 30, line 23 on 29 into line 6, tells, or puts, tells that quote to have it exactly right. Counsel, how many people were in the cell where this incident took place? You may have. I believe there were, your honor, I believe there were in excess of 30. The incident took place sometime right after midnight when the lieutenant in charge at the time moved Luther Pointer from, this was during the, this happened the 28th day of December of 2020, so COVID was going on, and when new people came into the jail, they were, for 48 hours, they were, they were isolated, and then they were, then they were in with everybody else in the minimal security jail cell, and I think cell 524 had around 30 individuals in it, and I believe it's around maybe one in the morning when he was placed in there. He was there just a few minutes. I don't know if the record has video, and which, which is another point I want to make. That video was disputed, and I don't think it should be used as summary judgment material for the defendant, and not only could you look at the video and see that there wasn't, one of their claims is that Luther Pointer came in looking for a fight. However, the video shows that's not true, and two depositions, deposition from Mr. Sweeney, who's the defendant's jail expert, and deposition from Jeff Iser both say on viewing the video that it doesn't look like that the client was looking for a fight, my client was looking for a fight, but again, that's something that's definitely a, in my view, definitely a jury question, not something that Rule 56 should even consider. Well, your opponent is probably going to argue that at worst, this was negligence on the part of the jailers and the county detention center that they didn't follow any regulation or rule. How do you respond to that? I respond, first, the defendant may be talking about the Franklin case. In Franklin, there were written regulations that were followed, and then it happened on the, I can't recall the exact, the Rape Protection Act wasn't followed one time, somebody was injured. That's not this case at all. There was no negligence. In fact, as I said, Captain Boston, who was employed since 2012, said that never did the BCDC, Barron County Detention Center, check. In fact, I've got this something, if I could read really quickly, that I got from Woodward versus Core Medical. It's a 7th Circuit, 2004 case, which was mentioned in a case that I can't recall was the 9th Circuit. It says, a constitutional injury can be substantially certain to follow from a practice, even if an injury has yet to occur. Otherwise, every Monell defendant would have one free pass for policies or practices. They're substantially certain to violate an individual's constitutional rights. That's what's happened here. There was no negligence. Every person who came in did not have his record of institutional violence considered before he was placed with everybody else. My opponent may confuse the violation with finally an injury. As I just read, an injury happened. Anyone that was looking over all those years where no one was ever checked for their violence, it was going to happen. This was the time it happened severely. Thank you very much. Your red light, yes. Sorry, I didn't see that. May it please the court, Mr. Butler. My name is Aaron Smith on behalf of Barron County and the Barron County Sheriff Aaron Bennett in his official capacity only. We are here today only on a Monell claim advanced by the plaintiff. The district court correctly granted summary judgment dismissing that Monell claim arising out of Luther Pointer's assault on December 28, 2020 for several reasons that I will discuss. The first of those being that there was no underlying constitutional violation. Pointer had no history of conflict with either Wicks or Guess. He did not report either of them as inmates that he should be kept away from during his incarceration. He testified that he was not afraid of them. In fact, he testified, I think it was Guess that he didn't even know. Well, he wasn't afraid of them because he didn't know them. Well, there's actually evidence that he did know them because he approached Mr. Wicks upon entering the cell and that's in the video that was discussed. And so, I don't believe the record would support that he did not know Wicks. I thought the assault and the problem occurred in something like 30 seconds of the plaintiff entering the cell. So, whatever could have happened in so short a time would have been unclear or muddled or indecisive, I would think, unless somebody said something that was illuminating, which I don't see that in the record anywhere. Is that wrong? There is no sound on the video, your honor, so we can't hear what's discussed. What the video does show is that Mr. Pointer enters the cell, puts his things down, walks directly to a bunk, which we now know Mr. Wicks was sitting on, a bottom bunk. And there's some gesticulating and pointing back and forth, and that can be interpreted in different ways. Within fairly short order, Mr. Wicks does attack Pointer and Guess follows. And then within, I think, 13 seconds, my deputies or the Barron County deputies have responded and the fight is over. And Mr. Pointer is left with grievous injuries. Yes, no doubt. Yes. This was a very violent attack by Wicks and Guess. It was a quick attack. They punched him. He hit the ground. Pointer, according to the video, was sitting on this what looks like a picnic table type get up in that common cell. So, whether or not Pointer was pointing at or gesticulating at, Pointer was seated at this bench and is attacked by these two individuals who your opponent has said had 30 or so episodes of violence involving people in cells. So, I guess the question is, what was the custom or policy of the county detention center that allowed such people to be in a minimum security kind of environment with a whole bunch of other people, any one of whom could have been attacked for violent random reasons by these two individuals? So, I would say in response to that, I think 30 is a bit excessive. There were a lot of disciplinary history over time. This is over a period of years. There had been violent episodes, no disputing that, but I think 30 is excessive and the record reflects what the actual numbers are. At this time, it was during COVID, and so the jail's practice was when a new inmate comes in, they came in and they were quarantined for 48 hours, and then in order to stop the spread of COVID, folks who were booked close in time with each other and Wicks, Guess, and Pointer were all booked, I think, within about two weeks of each other were placed into a cell, basically a holding cell, just to continue to confirm they didn't have COVID, and then they would move on to some final housing. So, they were housed together as part of the COVID protocols, which were unique, as we all know, to this time period. Based on your information, if there weren't 30 people, how many people were in the cell? 30 instances of prior, is what I was referring to, prior violent incidents. Okay, but how many people were in the cell? Your Honor, as I stand here, I'm sorry, I don't know the exact number. I don't think it was quite 30, but it was certainly in the teens at worst. It was not a small cell. It was a larger cell with a series of bunks. But the custom and or policy of the detention center was not to separate out people with violent records from people who had simply failed to pay child support. Well, that's not true. And Mr. Poynter actually had a violent record as well. He's had previous arrests for assault. So, one was aggravated, and I think one was simple assault, Your Honor, and that's in the record as well. So, it's not as if we have a just non-payment of child support versus violent criminals. That is not the case. In fact, our corrections expert, Ed Sweeney, testified that all three of these individuals would have been classified as adult general population violent. So, I think that's an important fact to consider. The way classification worked at the time was that inmates were classified according to charge, not race, but gender generally, and then stay aways were always checked. So, if an individual came in, the jail would have a history of people they should be kept away from. Obviously, they would be separated. I think what's important to note here is that, and I would point the court to this court's holding in Rager v. McMahon, which actually plaintiff relied upon in support. In that case, the plaintiff was placed in the cell with an individual who had a long history of institutional violence, a long history of criminal violence, but there was no indication whatsoever that that individual was going to cause any harm to the plaintiff in that cell on that day. This court said, while there might have been a general risk of harm, there was no reason for the jail to understand that there was a substantial risk of harm to that individual at that time. So, I think Rager's an important case. Also, Davis v. Chovrak, which is another ruling of this case in a similar scenario, where a general risk of harm, which plaintiffs have admitted that's what they're relying upon here, is that wicks and gas created a general risk of harm to the inmate population in general, not to Mr. Poynter individually. And this court's jurisprudence requires more than that. It requires a particularized form of harm to the plaintiff here, and that doesn't exist, and I think plaintiffs... If that's correct, then you can have somebody who is just, every time you lock this guy up, he's beating people up, but you don't know which person he's going to beat up. And so it's okay. It could be in certain circumstances, and what the Kentucky regulations require, and I forget the exact language, but if someone is particularly prone to violence, in other words, and the way that our expert has construed that is that they are regularly violent, almost uncontrollably violent, as opposed to someone who's gotten in some fights over four or five years, which is, I think, more of what we have here with wicks and gas. I also want to go to the requirements for a successful Monell claim. You have to have some pattern or practice of unconstitutional conduct, and we just don't have that here. Plaintiff points to these behavioral issues of wicks and gas over the years. However, that's just their institutional disciplinary history. There's no evidence whatsoever that there was some unconstitutional conduct of Barron County involved in those incidents. Well, your opposing counsel says that there was a pattern and practice in that all these inmates were put together and were not kept apart, and no matter that there were people included, and that there was no policy or practice, there was no policy preventing that, and the policy was to meld all these people together indiscriminately, and that was the defective policy and practice, according to your opposing counsel. I understand that, Judge, and what I would point out is wicks and gas had been in that same cell for approximately two weeks before Mr. Poynter entered, and there had been no violent incidents. Yeah, but how does that say that there was not a defective policy and that this incident was the foreseeable result of such a policy? Monell requires a higher standard, in that there be a history or a pattern of, let's say that there was an improper classification procedure ongoing. That would require, for a successful Monell claim, a showing that that had been going on for a persistent pattern of time and that constitutional violations similar, very similar, to those that occur with Mr. Poynter were occurring, and that Barron County had notice of that, and that doesn't exist in this case, Your Honor. In essence, that approach would allow a first-time offense against some poor individual who happens to be in this cell with these two violent people. Under your view, there's an opportunity for one event to happen without the jail being liable? No, perhaps not, Judge. If there were an individual employee of the jail who somehow committed an act that led to an event like this, they might well not be entitled to immunity and be subject to suit. The difference is this is a Monell claim, which requires an additional several layers of proof in order to prevail, and that's where the district court came down here and said we simply don't have the persistent pattern. We don't have the notice to the county of a persistent pattern of unconstitutional conduct, and we don't have deliberate indifference to that. We don't have any of those things that lead to a Monell claim. I might agree with you if it was an individual defendant at issue here. You cited two cases, the Rager case and the Davis case, and I've looked at your brief, which also cites them. They're both unpublished, it looks like, cases in that you're just citing Westlaw for them. What would you say would be your best case that's a published case from this circuit that would say that there is not a Monell claim here? That's an excellent question, Judge. Let me look through my notes real quick. I don't think Westmoreland touched on Butler or touched on Monell. I would cite to those two cases, certainly, Your Honor. I don't have any others as I stand here, and I apologize to the court. I do think that Westmoreland speaks to the absence of a constitutional violation here as a matter of an underlying question, because, obviously, that's the first step you've got to get past before you can reach the rest of the Monell standards. I would point to court there. I am short on time, so I do want to raise one more issue, which is the failure to plead in this case. Plaintiff's amended complaint criticizes the jail for refusing to inform new inmates of the names of people held in general population and alleged that that was delivered in difference. That claim was abandoned. The amended complaint went on to complain of the jail being understaffed and claimed that that was delivered in difference. That was also abandoned. Nowhere in the amended complaint is there any allegation that some custom or practice of failing to classify inmates led to Mr. Pointer's injuries. That's a technical matter, but the pleading, the operative pleading in this case, does not even allege. It wasn't raised until the summary judgment stage, this claim. I do want to point that out to the court. Can there be a de facto amendment of a complaint by virtue of the evidentiary development in the course of a summary judgment motion? Your Honor, the case law that I have is Grand Traverse Band of Ottawa and Chippewa Indians v. Blue Cross Blue Shield, which seems to rule that out. Plaintiffs cannot amend their complaint, which is the operative pleading in this matter, by simply including new factual allegations in their briefing in opposition to the motions for summary judgment. And also, Alexander v. Carter v. Byrd. This court has repeatedly held that a plaintiff seeking to expand her claims to assert new theories may not do so in response to summary judgment or on appeal. So you're saying the amended complaint does not raise the custom issue? It does not. It raises understaffing and it raises the plaintiff's initial theory was that the jail should have told Mr. Poynter, the other folks who were in the jail, so that he would know whether he should stay away from them or not. That was the original allegation. That was abandoned. Plaintiff's expert did not support that theory. The amendment included a claim of understaffing and made some other changes as well. But I think that's very important that this theory wasn't raised until after we filed our summary judgment motion. And when you're talking about the amended complaint, are you talking about the first amended complaint or is there a subsequent one? There is not a subsequent, Your Honor. So I'm happy to answer any further questions. My time is just about up. It looks like we would request that the court affirm the district court's grant of summary judgment and dismiss plaintiff's claims. Thank you. Thank you. I realize I only have two minutes, so I'll try. I'm not usually a fast talker, but I'll try to talk fast now. Can you address your opponent's argument that your first amended complaint does not raise the theory that you're relying on here? Absolutely. That's about the one thing that I agree with what the lower court did. I think in our reply brief, it's really brought out all the times we mentioned a policy and the lower court seemed to tell the defendant in its motion that policy and practice were about the synonymous. And I think that's the quickest way I can mention that is that that was brought up. And in our reply brief, I think we were I had all the points in there where we showed that we were complaining about policy. The second thing I want to talk about is, yes, deliberate indifference to the safety of our client. I've talked that at least through three jail administrations through almost eight, nine years, individuals were booked into the jail with never a consideration of their violent history as is required by the K.A.R. I think the defendant mentioned a Davis case, but that doesn't that Davis case didn't have anything to do with municipal liability. So I don't think it's a published case either. Westmoreland was didn't hold was sent back. I know the court knows it was was sent back to determine if Tyree had qualified immunity consistent with Kingsley and Bronner. So I'm not sure how that's that's helpful to the defendant. Oh, stop. The red light is on now. Thank you all. We thank you both for your argument and the case will be submitted.